IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
May 22, 2012 Session

## HUBERT MORRISON, ET AL. v. THE CITY OF BOLIVAR, ET AL.

Appeal from the Circuit Court for Hardeman County
No. 07-02-0264    J. Weber McCraw, Judge

No. W2011-01874-COA-R9-CV - Filed June 14, 2012

We granted this Tennessee Rule of Appellate Procedure 9 interlocutory appeal to answer the question of whether the Tennessee Revenue Bond Law, Tennessee Code Annotated Section 7-34-101, *et seq*., permits a private right of action on behalf of Appellees, utility rate payers, against Appellants, the City of Bolivar and its utility.  The trial court denied Appellants' motion to dismiss for failure to state a claim on the ground that Appellees could maintain a private cause of action because Tennessee Code Annotated Section 7-34-115(f) did not provide the sole remedy for violation of the statutory scheme. We hold that the Revenue Bond Law does not expressly create an individual private right of action, and that Appellees have not carried their burden to establish that the legislature intended to imply such a right. Accordingly, we reverse the judgment of the trial court and remand for entry of judgment in favor of Appellants.  Reversed and remanded.

**Tenn. R. App. P. 9. for an Interlocutory Appeal; Judgment of the Circuit Court Reversed and Remanded**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

William B. Hubbard and Marc R. Jenkins, Nashville, Tennessee, for the appellants, The City of Bolivar and the Bolivar Utility Department f/k/a Bolivar Gas System and Bolivar Water & Wastewater System.

George E. Barrett, Nashville, Tennessee and Charles H. Farmer, Jackson, Tennessee, for the appellees, Hubert Morrison, Robin Baker, Jackie Cox, Kenneth Kowen, and Whiteville Auto Parts.

**OPINION**

## Background

On October 3, 2007, Plaintiffs/Appellants Hubert Morrison, Robin Baker, Jackie Cox, Kenneth Kowen, and Whiteville Auto Parts (together, "Class Members," or "Appellees") filed this class action lawsuit in the Circuit Court at Hardeman County. The complaint alleged that the Defendants/Appellants City of Bolivar, Tennessee, and the Bolivar Utility Department f/k/a Bolivar Gas System and Bolivar Water & Wastewater System (together, "Appellants") had violated the Revenue Bond Law as codified at Tennessee Code Annotated Section 7-34-101 *et seq.* (the "Act"). Specifically, the Class Members asserted that Appellants had illegally transferred, or had overpaid, utility revenues to the city in violation of the Act. The Class Members' original complaint averred conversion. On November 9, 2007, Appellants moved to dismiss the complaint or, in the alternative, for summary judgment.

On December 21, 2009, the Class Members filed an amended complaint. The amended complaint reiterates the allegations that the Appellants violated the Act by making illegal transfers of surplus funds to the City of Bolivar, rather than using those funds to reduce rates. According to the amended complaint, the allegations of overpayments rely on a letter dated January 30, 2006, from Dennis Dycus, the Director of the Division of Municipal Audit of the State of Tennessee's Comptroller of the Treasure. As set out in the amended complaint, the letter provides:

> In reviewing the city's audited financial statements for the year ended June 30, 2005, I noted your independent auditor included a finding to the fact that the city had no supporting documentation for the in-lieu-of-tax payments received from the water/sewer and gas systems. Per the audited financial statements, each utility paid the city a $200,000 in-lieu-of-tax payment.
>
> Sections 7-34-115(a)(9) and 7-39-403, Tennessee Code Annotated (TCA), provide[] formulas and methods for determining the tax equivalency payments for water/sewer and gas systems respectively. Using the guidelines set forth in the TCA, the Municipal Technical Advisory Service (MTAS), developed schedules to assist local governments in calculating in-lieu-of-tax payments.
>
> Using the schedules and the information obtained from each utility's audited financial statements, we calculated what the in-

lieu-of-tax payments should have been. Per the calculations, the maximum amount of such tax the water/sewer system could have paid was $79,032. The maximum amount of such tax the gas system could have paid was $40,250. Assuming our calculations are correct, the water/sewer system paid $170,968 and the gas system paid $159,750 in excess of the maximum amount allowed under the statutes, for a total overpayment of $330,718.

Instead of a claim for conversion, the amended complaint asserts that the Class Members are entitled to monetary relief due to the Appellants' alleged violations of the Act. The amended complaint also contains claims for breach of express or implied contract, declaratory judgment, and unjust enrichment all based on violations of Tennessee Code Annotated Section 7-34-115. In response to the amended complaint, on February 8, 2010, Appellants renewed their motion to dismiss or, in the alternative, for summary judgment. On July 21, 2010, the trial court denied the motion.

On August 23, 2010, the Class Members filed a motion for class certification, seeking to certify the following class:

All residential and commercial customers of Defendant Municipal Utility System, who from July 1, 1993 through the present, paid for utility services, from any of the Defendant Municipal Utility Systems, and who were denied the benefits of the law by Defendants' actions (the "Class"). Excluded from this definition are any "industrial" or "special" customers as defined by Defendant Municipal Utility Systems.

The trial court granted the Class Members' motion for class certification, finding that the class was maintainable under Tennessee Rule of Civil Procedure 23.02(3). The court further determined that there was no antagonism between the Class Members.

On January 7, 2011, Appellants moved the trial court to reconsider the July 21, 2010 order denying the motion to dismiss, or in the alternative, for summary judgment, based upon the subsequently issued authority in *Brown v. Tennessee Title Loans, Inc.*, 328 S.W.3d 850 (Tenn. 2010). On May 10, 2011, the trial court denied the motion to reconsider.

On June 6, 2011, Appellants filed a motion for interlocutory appeal of the order denying the motion to reconsider in the circuit court. This motion was granted by the trial court. On September 2, 2011, Appellants filed a motion for permission to appeal the order

granting class certification in the circuit court; the trial court also granted this motion. On September 19, 2011, Appellants filed, with this Court, separate applications for permission to file an interlocutory appeal of the denial of its motion for dismissal or, in the alternative, for summary judgment, and denial of its motion to reconsider, and an application for interlocutory appeal of the trial court's grant of class certification. By Order of September 21, 2011, this Court consolidated the two applications for permission to appeal. By Order of October 18, 2011, this Court granted the consolidated applications.

Appellants raise three issues for review as stated in the brief:

1. Whether the trial court erred in finding that T.C.A. §7-34-115(f) is not the exclusive remedy.

2. Whether the trial court erred in finding that [Appellees] have a cause of action.

3. Whether the trial court erred in granting class certification because the interests and injuries of the class members are at odds.

## Standard of Review

It is well settled that a Tennessee Rule of Civil Procedure 12.02(6) motion to dismiss for failure to state a claim tests only the legal sufficiency of the complaint itself. *Cook v. Spinnakers of Rivergate, Inc.*, 878 S.W. 2d 934, 938 (Tenn. 1994). The grounds for such a motion are that the allegations of the complaint, if considered true, are not sufficient to constitute a cause of action as a matter of law. *Id*. A motion to dismiss should be granted only if it appears that the plaintiff cannot establish any facts in support of the claim that would warrant relief. *Doe v. Sundquist*, 2 S.W.3d 919, 922 (Tenn. 1999). We review a trial court's denial of a motion to dismiss *de novo*, with no presumption of correctness. *Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 716 (Tenn. 1997). Accordingly, our review of the trial court's legal conclusion that the Revenue Bond Act creates a private cause of action is *de novo*, with no presumption of correctness. Tenn. R. App. P. 13(d); *Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 716 (Tenn. 1997).

## Overview and Legislative History of the Revenue Bond Law, Tennessee Code Annotated Section 7-34-101 *et seq.*

The Revenue Bond Law was established in 1935. 1935 Tenn. Pub. Acts (Extra Session) Ch. 33. At that time, the Act contained a declaration of policy, which remains in

the current manifestation of the Act, *see infra*, and provides:

> (a) That it is hereby declared to be the policy of this State that any municipality acquiring, purchasing, constructing, reconstructing, improving, bettering or extending any public works pursuant to this Act, shall manage such public works in the most efficient manner consistent with sound economy and public advantage to the end that the services of the public works shall be furnished to the customer at the lowest possible cost.
>
> (b) No municipality shall operate such public works for gain or profit or primarily as a source of revenue to the municipality, but shall operate such public works for the use and benefit of the consumer served by such public works and for the promotion of the welfare and for the improvement of the health and safety of the inhabitants of the municipality.

1935 Tenn. Pub. Acts (Extra Session) Ch. 33, § 3; Tenn. Code Ann. § 7-34-103.

When it was originally enacted, the Act contained no remedial provisions for municipalities that violated the Act. **Id**. Although the Act was subsequently amended in 1949, 1969, and 1986, these amendments did not include remedial provisions. 1949 Tenn. Pub. Acts. Ch. 43; Tenn. Pub. Acts Ch. 335; 1986 Tenn. Pub. Acts Ch. 533. The 1969 amendment allowed municipalities that had retired all bonds issued to devote surplus revenues to "any municipal purpose." 1969 Tenn. Pub. Acts. Ch. 335 §§ 2–3. Consequently, after 1969, it was acceptable for a municipal utility to devote surplus revenues to the municipality, rather than to devote those surplus revenues solely to the reduction of rates.

A remedial provision was added to the Act by the 1993 amendments. 1993 Tenn. Pub. Acts. Ch. 509 § 1. This remedial provision is at issue in the instant appeal, and is set out at Tennessee Code Annotated Section 7-34-115(f) as follows:

> (f) If a municipality violates this section, it must repay any funds illegally transferred. If the municipality does not have sufficient funds to repay any funds illegally transferred, the municipality is required to submit a plan covering a period not to exceed five (5) years in which to repay the funds. The plan shall be submitted to and approved by the comptroller of the treasury or the comptroller's designee. Upon discovery of such violation through an audit, any city official in violation of this section is

subject to ouster under title 8, chapter 47.

The 1993 amendment also added language similar to that found in the declaration of policy at Tennessee Code Annotated Section 7-34-103. Specifically, that the "municipal utility systems shall be operated on sound business principles as self-sufficient entities. . . . [N]o public works shall operate for gain or profit or as a source of revenue to a governmental entity, but shall operate for the use and benefit of the consumers served by such public works and for the improvement of the health and safety of the inhabitants of the area served." 1993 Tenn. Pub. Acts. Ch. 509 §1; Tenn. Code Ann. § 7-34-115(a).

Since its enactment, the Act has permitted utilities and municipalities to spend funds generated by the utilities on nine separate categories, namely:

> Any municipality shall devote all revenues derived from a public works to or for:
>
> (1) The payment of all operating expenses;
> (2) Bond interest and retirement or sinking fund payments, or both;
> (3) The acquisition and improvement of public works;
> (4) Contingencies;
> (5) The payment of other obligations incurred in the operation and maintenance of the public works and the furnishing of services;
> (6) The redemption and purchase of bonds, in which case such bonds shall be cancelled;
> (7) The creation and maintenance of a cash working fund;
> (8) The payment of an amount to the general fund of the municipality not to exceed a cumulative return of six percent (6%) per annum of any equity invested from the general fund, if any, of the municipality. Equity investment includes any contributions or purchases made by the municipality from the general fund, including, but not limited to, cash contributions, retirement of debt service and purchases of equipment, so long as these contributions are reflected in the utility's financial statement; provided, that such definition of equity investment shall not change the status under this section of any payments made pursuant to any provision of a city charter in existence on or before July 1, 1993; and
> (9) If the governing body of the municipality by resolution so

> requests, payments to the municipality in lieu of ad valorem tax on the property of the public works within the corporate limits of the municipality not to exceed the amount of taxes payable on privately owned property of similar nature.

Tenn. Code Ann. § 7-34-115(a).

The 1993 amendments closed the loophole that had allowed municipalities that had retired all bonds to devote surplus revenues to "any municipal purpose," and instead require that: "Any surplus remaining, after establishment of proper reserves, if any, shall be devoted solely to the reduction of rates." Tenn. Code Ann. § 7-34-115(b). The Senate debated this particular amendment on May 4, 1993. The transcript of the debate, which is included in our appellate record, provides, in relevant part, as follows:

> [Comptroller] Morgan: As it related to in lieu of taxes, I really don't think we're creating a problem, but we certainly don't intend to affect any of the other sections that provide for in lieu of tax payments. What happens is: The only thing we're changing that relates to payments from a utility to a general government is that we're just deleting the ability of a general government to reach into a utility and transfer surplus monies. Current law provides, the sections we're amending, that after the application of excess surpluses to a whole range of purposes, the final purpose is it can be used for any lawful municipal purpose. That's what the business tax study committee was quite concerned with, and that has been the mechanism by which utilities have been tapped to support general government operations. That is what this bill seeks to close, is that last purpose which would be any other municipal purpose that would be.

The Senate continued its debate on May 17, 1993, with Senator Henry stating, in relevant part, as follows:

> [Senator] Henry: Mr. Speaker, amendment n[umber] one by the State and Local Government committee is a rewrite of the bill and is set out in considerable detail the nature of the payments which a municipality owned utility may make to its municipality. It provides that it can pay them for items one two three four and so forth, down, but anything over that has to be

> used for rate reduction and **if a municipality violates this provision, puts too much in the general fund, does not use it for rate reductions it must repay the utility and therefore to the people who patronize the utility the amount improperly transferred to the general fund**.

(emphasis added).

Having discussed the relevant provisions of the Act and the legislative history, we now turn to address the Appellants' first issue: whether the Act creates a private right of action.

### Private Right of Action

The determination of whether a statute creates a private right of action is a matter of statutory construction. ***Premium Fin. Corp. of Am. v. Crump Ins. Servs. of Memphis, Inc.***, 978 S.W.2d 91, 93 (Tenn. 1998).[1] It is well settled that our essential duty in statutory

---

[1] In ***Premium Finance***, the Tennessee Supreme Court held that, under the Premium Finance Company Act, Tennessee Code Annotated Section 56-37-101 *et seq*., the legislature did not impliedly grant a statutory right of action to premium finance companies against insurance companies for the failure to return an unearned premium to the finance company after cancellation of the underlying insurance contract. ***Premium Finance***, 978 S.W.2d at 92. Like the Act at issue here, the Premium Finance Company Act contains special remedies for its enforcement. ***Id***. Because the act contained specific remedies for its enforcement, the Court found that it should not imply a private right of action unless such legislative intent was "manifestly clear." ***Id***.

Likewise, in ***Petty v. Daimler/Chrysler Corp***., 91 S.W.3d 765 (Tenn. Ct. App. 2002), *perm. app. denied* (Tenn. Sept. 9, 2002), plaintiff brought an action for violation of the Tennessee motor vehicle glass safety statutes. These statutes did not contain an express private right of action, ***Id***. at 768, but did provide the Commissioner of the Tennessee Department of Safety with the authority to approve certain types of glass. ***Id***. The remedy for violations of the statute was the commissioner's suspension of the registration of any motor vehicle not in compliance with the statute. ***Id***. Accordingly, the Court found that "the only remedy provided by statute is to be had by the state," and did not imply a private right of action. ***Id***.

In ***Reed v. Alamo Rent-A-Car, Inc.***, 4 S.W.3d 677 (Tenn. Ct. App. 1999), *perm. app. denied* (Tenn. Oct. 4, 1999), plaintiff sought to recover damages for Alamo's alleged violation of Tennessee Code Annotated Section 50-6-123, a portion of the Tennessee Workers' Compensation Law that establishes a system of case management for coordinating the medical care provided to employees under law. ***Id***. at 688–89. This Court concluded that Tennessee Code Annotated Section 50-6-123 did not provide a private right of action for negligent case management. ***Id***. at 689–90. The Court acknowledged that the plaintiff was an intended beneficiary, ***Id***., but also recognized that the primary duty was imposed on the Commissioner of the Tennessee Department of Labor. ***Id***. Furthermore, the Workers' Compensation Law provided special remedies for its enforcement. Accordingly, this Court declined "to engraft additional requirements onto the enforcement scheme designed by the legislature." ***Id***.

construction is to determine and implement the legislature's intent without limiting or expanding the statute's coverage beyond what the legislature intended. *Id*.; *Hawks v. City of Westmoreland*, 960 S.W.2d 10, 16 (Tenn. 1997). When the existence of a private right of action depends on the contents of the statute, "our courts are not privileged to create such a right under the guise of liberal interpretation of the statute." *Premium Fin. Corp.*, 978 S.W.2d at 93; *see* *Hogan v. McDaniel*, 319 S.W.2d 221, 223 (Tenn. 1958) ("Judicial legislation has long been regarded by the legal profession as unwise, if not dangerous business."). The authority to create a private right of action pursuant to statute is the province of the legislature. *Premium Fin. Corp*., 978 S.W.2d at 93; *Reed v. Alamo Rent–A–Car, Inc.,* 4 S.W.3d 677, 689 (Tenn. Ct. App.1999).

To determine whether the legislature intended to create a private right of action for violation of the Revenue Bond Law, we begin with the express statutory language. *See Ergon, Inc. v. Amoco Oil Co.*, 966 F. Supp. 577, 584 (W.D. Tenn. 1997); *Premium Fin. Corp.*, 978 S.W.2d at 93. Here, there is no dispute that the express language of the Act does not create such a right of action on behalf of a rate payer against the municipality or its utility—whether in the specific section prescribing the remedy for violation of the Act (i.e., Tenn. Code Ann. §7-34-115(f), or in the sections outlining the use of utility revenues (i.e., Tenn. Code Ann. §7-34-115(a)(1)–(9) and (b)).[2]

In *Brown v. Tennessee Title Loans, Inc.*, 328 S.W.3d 850 (Tenn. 2010), our Supreme Court found that the legislature did not expressly create a right of action, nor did it imply such a right permitting pledgors to bring private actions against title pledge lenders who allegedly charged excessive interest and fees under the Tennessee Title Pledge Act, Tennessee Code Annotated Section 45-15-101 *et seq.*. Like the Act at issue here, the Title Pledge Act contains specific remedies for its enforcement. The Supreme Court found that the implication of allowing a private cause of action would be inconsistent with the purposes set forth by the legislature. In reaching its decision, the Supreme Court succinctly outlined the law applicable to questions of whether a private cause of action may exist in cases, such as the one at bar, where the statute does not expressly create that right:

> If a statute does not expressly create a private right of action, our next inquiry is whether the legislature otherwise indicated an intention to imply such a right in the statute. *Premium Fin.*

---

[2] By contrast, the Tennessee Consumer Protection Act is one in which the legislature expressly grants a private right of action. Under that statute, "[a]ny person who suffers an ascertainable loss . . . as a result of the use or employment by another person of an unfair or deceptive act or practice declared to be unlawful by this part, may bring an action individually to recover actual damages." Tenn. Code Ann. § 47-18-109(a)(1) (2001); *see also* *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 925 (Tenn. 1998).

***Corp.***, 978 S.W.2d at 93; ***Reed***, 4 S.W.3d at 689. In this analysis, we look to the statutory structure and legislative history. ***Id***. Appropriate factors to consider include (1) whether the party bringing the cause of action is an intended beneficiary within the protection of the statute, (2) whether there is any indication of legislative intent, express or implied, to create or deny the private right of action, and (3) whether implying such a remedy is consistent with the underlying purposes of the legislation. ***Ergon***, 966 F.Supp. at 583–84; ***Buckner v. Carlton***, 623 S.W.2d 102, 105 (Tenn. Ct. App. 1981).[3]

***Brown***, 328 S.W.3d at 855-56. The ***Brown*** Court further noted that "[t]he burden ultimately falls on the plaintiff to establish that a private right of action exists under the statute." ***Id***. (citing ***Premium Fin. Corp***., 978 S.W.2d at 93).[4]

---

[3] As noted by the Court:

These factors originally appeared in the United States Supreme Court's opinion in ***Cort v. Ash***, which set forth the standard for determining whether a private right of action is implicit in a federal statute. *See* 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). ***Cort*** also articulated a fourth factor—whether the cause of action is traditionally relegated to state law—which is inapplicable to the interpretation of state statutes and, therefore, omitted from the analysis. *See* ***Ergon,*** 966 F.Supp. at 584 n.9. Buckner was the first Tennessee decision to analyze the three applicable ***Cort*** factors to determine whether a Tennessee statute implied a private right of action.

***Brown***, 328 S.W.3d at 856 n. 4.

[4] We note that the Tennessee legislature has voted (Pub. Act Ch. 759) to amend Tennessee Code Annotated, Title 1, Chapter 3, Part 1, effective July 1, 2012 (SB2140, HB 2809), to include Section 1-3-119, which will provide, in relevant part, as follows:

(a) In order for legislation enacted by the general assembly to create or confer a private right of action, the legislation must contain express language creating or conferring the right.
(b) In the absence of the express language required by subsection (a), no court of this state, licensing board or administrative agency shall construe or interpret a statute to impliedly create or confer a private right of action except as otherwise provided in this section.
(c) Nothing in this section shall be construed in any way to impair the ability of a court to:

(continued...)

Having determined above that the Act does not expressly create a private cause of action, we now turn to apply the **Brown** factors to the instant case to determine whether a private cause of action is implicitly available to these plaintiffs. As we apply each factor, we are cognizant of the fact that the burden of proof is on the Class Members on this issue.

## A. Whether the Class Members are Intended Beneficiaries under the Act.

From the plain language of Tennessee Code Annotated Section 7-34-115(f), *supra*, it is clear that any violation of the statutory scheme will result in the municipality having to

---

[4](...continued)

> (1) Recognize a private right of action that was recognized before the effective date of this section by the courts of this state as arising under a statute, unless the statute is amended after the effective date of this section to expressly bar the private right of action;
> (2) Create or confer a private right of action in the absence of a controlling statute on each cause of action contained in the complaint if such action is based on the common law;
> (3) Utilize the doctrine of negligence per se; or
> (4) Recognize a private right of action commenced by a state or local governmental entity to collect fees owed for a governmental service or to recover such fees from a party that is obligated to bill and collect fees owed others for a governmental service.
> (d) Nothing in this section shall be construed in any way to impair the ability of a state or local regulatory or licensing agency to enforce rules pursuant to the Uniform Administrative Procedures Act, codified in Title 4, Chapter 5, if such rules were duly enacted through the rulemaking authority granted to any such agency by statute.

Although the legislature specifically adopted this amendment for prospective application to those lawsuits filed on or after July 1, 2012, the debate that occurred on the Senate floor indicates the legislative intent to attempt to clarify when a private cause of action is granted by requiring that the statute expressly grant that private cause of action. Senator Kelsey, the proponent of the bill, explained that, to date, courts have had difficulty in determining whether the legislature intended to confer a private right of action in statutes where there is no explicit grant of that right. In explanation, Senator Kelsey quoted **Brown** to the Judicial Committee, stating that "implied rights, by definition, must be found from what was intended but not specifically stated." The amendment will relieve courts from this analysis. When Section 1-3-119 is added to our statutes, courts will be precluded from implying a private right of action unless the legislative intent to do so is explicit in the statute's text. If a statute is silent, then Section (b) of the amended statute will preclude courts from creating a private right of action by inference, unless certain criteria are met. Because the amendment is not applicable to the instant appeal, we are not relieved from applying the **Brown** factors to determine whether a private right of action is implicitly available to these plaintiffs. However, if this statute had been in effect and applicable to the instant appeal, we would not have engaged in the **Brown** analysis, but would have clearly known that the legislative intent was to preclude private rights of action because the right is not explicit in the Act.

-11-

pay back any misapplied funds to the utility. The statute does not contemplate that these funds will automatically be used to reduce rates. Rather, Tennessee Code Annotated Section 7-24-115(a) lists several appropriate options for use of utility revenues. Only when these criteria are satisfied and the utility has adequate reserves, is it required to apply surplus funds to reduce rates. Consequently, the rate payer is not the direct beneficiary of the statutory remedy; rather, it is the utility that is to receive any misapplied funds from the municipality and it is the utility's decision how it will apply those funds to the expenses, contingencies, improvements, etc. set out in Subsection (a) of Tennessee Code Annotated Section 7-34-115.

Although, as set out above, Senator Henry correctly states that the rate payers will be indirect beneficiaries of the statutory scheme: "If a municipality violates this provision, puts too much in the general fund, does not use it for rate reductions it must repay the utility and therefore to the people who patronize the utility the amount improperly transferred to the general fund," there is nothing in the Act from which we can infer that the rate payers are the direct beneficiaries. However, even if we allow that they are indirect beneficiaries under the statute, this fact is not sufficient to establish a private cause of action under the ***Brown*** analysis. ***Brown***, 328 S.W.3d at 858 ("The mere fact that the legislature enacted the TTPA to protect and benefit pledgors is not alone sufficient, however, to imply a private right of action. . . . We must also consider the remaining two factors in the inquiry").

## B. Legislative Intent

The second ***Brown*** factor is whether there is any indication of legislative intent, express or implied, to create or deny a private right of action. Again, Appellees bear the burden of establishing the evidence of legislative intent to create such a right.

We have reviewed the Act's legislative history, some of which is set out above. We find nothing therein that would support the trial court's finding that the legislature intended to imply a private right of action in the Act. As discussed above, Section (f) of Tennessee Code Annotated Section 7-34-115 provides a remedy for violation of the Act. The remedy includes repayment of funds transferred to the municipality in violation of the Act, and the possibility of ouster of city officials in connection with the disallowed transfer of funds.

In Tennessee, "if a statute creates a new right and prescribes a remedy for its enforcement, then the prescribed remedy is exclusive." ***Guy v. Mutual of Omaha Ins. Co.***, 79 S.W.3d 528, 536 (Tenn. 1999); ***Hodges v. S.C. Toof & Co***, 833 S.W.2d 896, 899 (Tenn. 1999); ***Turner v. Harris***, 281 S.W.2d 661, 665 (Tenn. 1955). Regarding the issue of exclusive remedies, Tennessee rulings are consistent with those of the United States Supreme Court. In ***Transamerica Mortgage Advisors, Inc. v. Lewis***, 444 U.S. 11, 19, 100 S.Ct. 242, 247 (1979), the Supreme Court stated, in relevant part, that, "when a statute expressly

-12-

provides a particular remedy or remedies, a court must be chary of reading others into it. When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode [of recovery]." *Id*.

According to the amended complaint, in the instant case, the Appellees are not seeking ouster of city officials for violation of the Act. Rather, they are seeking a transfer of funds from the City of Bolivar and/or from the municipal utility. However, under Section (f), the remedy is clear and limited, requiring a municipality to repay the funds to the utility (if the municipality cannot pay the funds immediately, it is required to fashion a repayment plan not to exceed five years). There is nothing in the Act from which to infer that a rate payer has any private right to seek monetary damages for violation of the Act. Concerning the enactment of specific remedies under Tennessee Code Annotated Section 7-34-115(f), Comptroller Morgan explained that "[t]he only thing we're changing . . . is we're just deleting the ability of the general government to reach into a utility and transfer surplus monies . . . after the application of excess surpluses for a whole range of purposes, the final purpose is it can be used for any lawful municipal purpose." When asked, by Senator Gilbert, about the remedy of ouster, Comptroller Morgan explained that the ouster provision was an attempt to make "it clear that the law in Tennessee is not that you can divert monies from a utility system and use it to finance general government." However, Comptroller Morgan specifically stated that the purpose of the amendment was "not to impair [the utility's] ability to issue debt and do other things that they have to do."

In their brief, Appellees rely upon two cases, *Pope v. Dykes*, 93 S.W. 85 (Tenn. 1904), and *Badgett v. Rogers*, 436 S.W.2d 292 (Tenn. 1968) for the proposition that they have a cause of action to protect monies paid into the municipal utility. Both *Pope* and *Badgett* address a taxpayers right to bring suit when those taxes are misapplied by the municipality. In *Pope*, our Supreme Court recognized that "a taxpayer himself and other taxpayers, might maintain an action to prevent the commission of an unlawful act, the effect of which would be to increase his burden of taxation, or to divert a public fund from the purpose for which it was intended by law." *Pope*, 93 S.W.85 at 88. In *Badgett*, the Supreme Court addressed whether an "individual citizen and taxpayer of a municipality [has] standing to seek relief against municipal officials for alleged misappropriation or misuse of tax funds." *Badgett*, 436 S.W. 2d at 293. These cases are distinguishable from the instant appeal. This case deals particularly with the Revenue Bond Law, which has nothing to do with tax payments. Unlike the case-at-bar, *Pope* and *Badgett* dealt with general misuse of taxes by municipalities; here, the actions of the utility are governed by a specific statutory schemes. Here, we are dealing only with the question of whether the Revenue Bond Law contains an implied right of private action. As discussed above, in order to make that determination, we must look to the contents of the Act and not to general principals of equity or standing. Accordingly, if the Act does not implicitly give a right to private action, we cannot assume that the legislature,

nonetheless, meant to allow citizens to file suit for violations of the Act in order to protect the monies those citizens may have paid for services.

From the foregoing legislative history, it is clear that the remedial scheme set out in Tennessee Code Annotated Section 7-34-115(f) was chosen because it did not endanger the utility's ability to meet the obligations necessary to ensure its ability to continue to provide utilities to the rate payers. The utility and the rate payers cannot recover the same funds. If the rate payers are allowed a private right to seek repayment of revenues for violation of the Act, this would be antagonistic to the remedial scheme envisioned by the legislature, whereby a right to recover these funds is solely granted to the utility, which then may exercise its autonomy to apply the recovered funds as it deems necessary in the management of the utility. *See also **Premium Finance***, 978 S.W.2d at 994; ***Petty***, 91 S.W.3d at 768; ***Reed***, 4 S.W.3d at 690.

## C. Whether an Implied Right to Private Action would be Consistent with the Underlying Purpose of the Act

The third ***Brown*** criterion is whether an implied right of action would be consistent with the underlying purposes of the statute. From our reading of the plain language of the Act, we conclude that the legislature intended dual purposes, namely: (1) to operate the public utilities on sound business principles as self-sufficient entities so that services may be furnished to consumers at the lowest rate; and (2) to prevent municipalities from operating their public utilities as a source of gain or revenue for the municipality. Tenn. Code Ann. §§ 7-34-103 and 7-34-115(a). The question, then, is whether the remedial scheme, as set out at Tennessee Code Annotated Section 7-34-115, achieves both of these purposes. We conclude that it does. First, the municipality is required to apply utility revenues to nine enumerated categories, Tenn. Code Ann. §7-34-115(a). This requirement is in furtherance of the goal of operating the utilities on sound business principles and the goal of self-sufficiency. Under this scheme, the utility is required to establish reserves and funds for other contingencies before issuing rate reductions. The remedial scheme for violation of Section (a) is set out at Tennessee Code Annotated Section 7-34-115(f). Under Section (f), the municipality must repay funds to the utility, thereby ensuring that the public works is not operating as a source of revenue for the municipality.

The requirement that funds transferred in violation of the Act must be repaid to the utility illustrate the legislature's intent to meet the purpose of the statute that utilities maintain self-sufficiency, operate at the lowest possible cost to consumers, and do not operate as a source of revenue for the municipality. The existence of a private right of action would undermine these goals. Direct payment to rate payers would, necessarily, result in less operating funds for use by the utility. This fact would make it more difficult for the utility

to be self-sufficient, and would usurp the utilities' ability to operate at the lowest possible cost to consumers and on "sound business principles as self-sufficient entities." Tenn. Code Ann. § 7-34-1159(a).

Having determined that the Revenue Bond Law does not expressly create an individual private right of action, and that Appellees have not carried their burden to establish that the legislature intended to imply such a right, we pretermit the remaining issue concerning the certification of the class.

For the foregoing reasons, we reverse the judgment of the trial court and remand for entry of judgment in favor of Appellants. Costs of this appeal are assessed, in equal part, to the Appellees, Hubert Morrison, Robin Baker, Jackie Cox, Kenneth Kowen, and Whiteville Auto Parts, for all of which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE